UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:25-cr-101 |
| v. | ) | |
| | ) | |
| MARCUS DEMETRIUS BROOKS | ) | Judges Collier/Dumitru |

**M E M O R A N D U M**

On June 15, 2026, Magistrate Judge Dumitru issued a Report and Recommendation (the "R&R") as to Defendant Marcus Demetrius Brooks's amended motion to suppress (Doc. 17). (Doc. 38.) Defendant timely filed objections to the R&R, which are now before the Court. (Doc. 43.) The United States (the "Government") filed a response in opposition (Doc. 48), and Defendant filed a reply (Doc. 51).

The Court has reviewed the transcript of the evidentiary hearing before the Magistrate Judge, the exhibits introduced at the evidentiary hearing, and the briefs the parties filed before and after the R&R issued, including the supplemental briefs the parties submitted after the hearing. Defendant's objections to the R&R (Doc. 43) will be **OVERRULED**, Defendant's amended motion to suppress (Doc. 17) will be **DENIED**, and the R&R (Doc. 38) will be **ADOPTED in part and MODIFIED in part**. As further explained below, the Court will make the following two modifications to the R&R: (i) Defendant was detained when Sergeant Wood and Officer Mingo first put their hands on Defendant's shoulder and arm, respectively, which was before Defendant handed his bag to a third party (*contra id.* at 15), and (ii) the inevitable-discovery doctrine does not justify the officers' search of Defendant's bag, but the search-incident-to-arrest doctrine does (*contra id.* at 16).

## I. FACTUAL BACKGROUND

The following summary of the factual background is derived from the R&R (Doc. 38) and the evidence presented at the evidentiary hearing held on April 30, 2026 (Doc. 33). The incident began when Chattanooga Police Department ("CPD") Officers Mingo and Dagostino received a dispatch call indicating that a fight was in progress at 2300 Windsor Street in East Chattanooga (the "Property") between apartments 105 and 108. The information conveyed to the officers from the call included that the fight involved a "group of young boys" who were "wearing all different colors," and that no weapons had been seen. Based on Officer Dagostino's experience working in East Chattanooga for several years, he understood that the Property was located in a high-crime area that was one of the busiest in terms of police call volume. In fact, Officer Dagostino himself had responded to calls to the Property many times before, including calls for "disorders," as well as for "[d]omestic violence, . . . shootings, homicides, [and] narcotics incidents." (Hrg. Tr. 43:22–44:6.)

Officers Mingo and Dagostino arrived at the Property, as did CPD Sergeant Bryan Wood. As they exited their vehicles and began to walk towards the entrance to a courtyard area between two apartment buildings, the officers could hear someone yelling. The yelling continued as the officers turned the corner into the courtyard and approached the man yelling—later identified as Defendant—as he walked past a small group of people gathered in a covered area in the courtyard, followed by a young woman. Officer Dagostino testified that Defendant "sounded agitated," "as if he was in an argument." (Hrg. Tr. 14:3–9.) The officers did not see any physical signs of the reported fight, however. (*Id.* 28:7–24.) Officer Mingo followed Defendant and the young woman as they walked towards a covered breezeway within the 105–108 apartment building (the building that the dispatch call had identified), while Officer Dagostino and Sergeant Wood remained in the

courtyard. Four other individuals were also around the area between the courtyard and the breezeway, including a young boy getting his hair cut.

Defendant was holding an infant and carrying a small, black cross-body bag (the "Bag"). Then, as the R&R details:

> Officer Mingo attempted to speak with Defendant, but Defendant ignored him while repeatedly kissing the infant. Officer Mingo then tapped on Defendant's shoulder and told him he needed to talk to him. Defendant responded by saying "what's up" and walked back into the courtyard away from Officer Mingo and towards Officer Dagostino and Sergeant Wood. Officer Mingo followed and continued to ask Defendant to speak with him, asking "what's going on?", "why are you out here yelling?", and "can you come and talk to me?" But Defendant continued to walk away from Officer Mingo and did not respond. Officer Dagostino testified that Defendant's evasiveness made him suspicious that Defendant was involved in the reported fight. During this exchange, the four individuals remained at the entrance to the breezeway along with the young woman that had been following Defendant, and another woman holding a baby carrier.
>
> In the courtyard, Sergeant Wood intercepted Defendant—who was still walking away from Officer Mingo—and asked him to hand the baby to the woman who had approached with the baby carrier. When Defendant did not respond, Sergeant Wood put his hand on Defendant's shoulder and asked him a second time. At this point, the person cutting the young boy's hair in the breezeway began to yell in protest about the officer touching Defendant.
>
> The woman with the baby carrier took the baby and walked away, at which point Defendant turned away from the group of officers. Officer Mingo reached out and grabbed Defendant's arm, told Defendant he was being detained, and asked Defendant to talk to him. Defendant kept pulling away and told the Officer that he was "chillin'." Officer Mingo held onto Defendant's forearm and continued to ask what was going on. Officer Mingo asked if Defendant had any weapons on him. Defendant pulled the Bag off over his head with his free arm and handed it to the young woman nearby (the same woman that had followed him into the breezeway). Officer Dagostino immediately approached the woman and retrieved the Bag. Officer Dagostino testified that he retrieved the Bag because he found it suspicious that Defendant tried to hand it off so quickly based on his experience with individuals attempting to distance themselves from contraband during police encounters. Officer Dagostino also testified that he had, in his experience, seen individuals carry firearms or drugs and other contraband in that type of bag. Once he had the Bag, Officer Dagostino testified that he felt that it was disproportionately heavy for its size and suspected there could be a firearm in it.

(Doc. 38 at 3–4 (internal citations to hearing transcript and exhibits omitted).)

Meanwhile, Officer Mingo handcuffed Defendant and patted him down, while explaining that he just wanted to make sure Defendant did not have any weapons. In response, Defendant stated, "I don't got no weapons" and "give my girl my bag and let me get on down [to jail]." As the R&R notes, "Officer Dagostino testified that the purpose of detaining Defendant at that time was officer safety and investigation. He further explained that he did not return the Bag to the young woman because he was concerned that it contained a firearm and was concerned about the potential danger of another person on the scene having a firearm." (*Id.* at 4–5.) That said, he also testified that officers may permit arrestees to leave their personal property with a loved one before being taken to jail. (Hrg. Tr. 86:4–8.) When Officer Dagostino took the Bag from the young woman, the Bag was unzipped, but no firearm was visible.

As Defendant continued to pace around the area, Officers Forgey and Woodson arrived at the scene. Officer Forgey immediately recognized Defendant and advised that Defendant was criminally trespassed from the Property. Officer Forgey testified that Defendant would have been arrested for trespassing at that point, regardless of whether or not his Bag contained contraband. (There is no dispute that the officers had probable cause to arrest Defendant for trespassing.) Officer Dagostino explained to Officer Forgey that Defendant had tried to hand off the Bag. Officer Forgey then opened the unzipped Bag, manipulated the inside compartment, and saw a firearm inside.

The officers led Defendant to a patrol car. Officer Dagostino emptied the Bag on the hood of the patrol car and processed its contents, which included a SCCY Model CPX-2 9-millimeter pistol. On the subsequent drive to the jail, Defendant made various unsolicited statements about the fight and the firearm, before and after Officer Dagostino read him his *Miranda* rights.

## II. PROCEDURAL BACKGROUND

Defendant moved to suppress "1) a firearm seized from a black bag obtained in violation of the Fourth Amendment of the United States Constitution; and 2) statements which law enforcement obtained which are the 'fruit of the poisonous tree.'" (Doc. 17 at 1.) The motion was referred to Magistrate Judge Dumitru, who held a hearing on April 30, 2026. (Doc. 33.) Several exhibits were presented at the hearing, and Officers Mingo, Dagostino, and Forgey testified.

On June 15, 2026, Magistrate Judge Dumitru issued the R&R on Defendant's motion, recommending it be denied based on the following four legal conclusions: (1) the *Terry* stop and seizure of the Bag were constitutional; (2) there was probable cause to support Defendant's arrest; (3) the firearm would have inevitably been discovered during the related inventory; and (4) Defendant's "fruit of the poisonous tree" argument and the Government's good-faith exception argument need not be addressed. (Doc. 38 at 8.) In reaching these conclusions, Magistrate Judge Dumitru noted that the officers' testimony was "both credible and consistent with the content of the bodycam videos and has not been challenged by way of any extrinsic evidence." (*Id.* at 11.)

On July 16, 2026, Defendant filed objections to the R&R, arguing that conclusions (1), (3), and (4) from the above list were erroneous. (Doc. 43 at 1.) Defendant further argues that the R&R erred by failing to address "whether Officer Forgey's manipulation of the bag satisfied the plain view or search incident to arrest exceptions to the Fourth Amendment's warrant requirement (it satisfied neither)." (*Id.*) In making his arguments, Defendant also disputes certain factual conclusions in the R&R. (*See, e.g.*, *id.* at 3 (disputing characterization that Defendant was agitated and evasive), 7 (disputing conclusion that officers did not have the scene under control, even after

Defendant was handcuffed).) As a result, Defendant argues, the Court should reject the R&R and grant Defendant's motion to suppress physical evidence and statements. (*See id.*)

## III. STANDARD OF REVIEW

"A District Judge must determine *de novo* any part of a Magistrate Judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1). After reviewing the evidence, the district court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

As to credibility of witness testimony, *de novo* review does not require the district court to rehear witnesses whose testimony has been evaluated by the magistrate judge. *See United States v. Raddatz*, 447 U.S. 667, 673–74 (1980). By conducting the evidentiary hearing, the magistrate judge has the opportunity to observe and hear the witnesses and assess their demeanor, putting the magistrate judge in the best position to determine witness credibility. *Moss v. Hofbauer*, 286 F.3d 851, 868 (6th Cir. 2002). The magistrate judge's assessment of witnesses' testimony is therefore entitled to deference by the district court. *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003).

## IV. ANALYSIS

### A. The R&R properly concluded that the *Terry* stop was constitutional.

The Fourth Amendment prohibits "unreasonable . . . seizures" to protect "[t]he right of the people to be secure in their persons." U.S. Const. amend. IV. It is well established that "[u]nder the Fourth Amendment, there are three types of permissible encounters between police and citizens: consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary

involuntary detention or *Terry* stop which must be predicated upon 'reasonable suspicion;' and arrests which must be based on probable cause." *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004) (quoting *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir. 1994)).

At issue here is the second type of encounter: the *Terry* stop. In evaluating the constitutionality of a *Terry* stop, the court engages in a two-part analysis to assess the stop's reasonableness. *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010) (quoting *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006)). The first part of the analysis "ask[s] whether there was a proper basis for the stop, and, if the stop was proper," then the second part of the analysis "determine[s] whether the degree of intrusion . . . was reasonably related in scope to the situation at hand." *Id.* (quoting *Caruthers*, 458 F.3d at 464). The Court will address both parts of the *Terry* analysis in turn.

**1. The officers had reasonable suspicion to conduct the *Terry* stop.**

Reasonable suspicion sufficient to satisfy the first part of the *Terry* analysis "exists where the officer can articulate specific, particularized facts that amount to more than a 'hunch' that criminal activity may be afoot." *United States v. Jeter*, 721 F.3d 746, 751 (6th Cir. 2013) (quoting *United States v. Young*, 707 F.3d 598, 604–05 (6th Cir. 2012)). "In examining the totality of the circumstances . . . the officer's reasonable suspicion need not arise exclusively from his own direct observations." *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008). "Rather, it can be derived from such sources as informant tips, dispatch information, and directions from other officers." *Id.* (citing *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006)). The Court of Appeals for the Sixth Circuit has also condoned placing at least a "small amount of weight" on "contextual factors, such as high-crime," in assessing whether reasonable suspicion existed to justify a stop. *Young*, 707

F.3d at 603–04. But such factors "should not be given too much weight because they raise concerns of racial, ethnic, and socioeconomic profiling." *Id.* at 603.

An officer's decision to conduct a *Terry* stop must be "justified at its inception." *Terry v. Ohio*, 392 U.S. 1, 20 (1968). So, before assessing the officers' basis for the stop, the Court must first clarify when Defendant was stopped within the meaning of *Terry*. On this point, the Court will modify the R&R, which concluded that Defendant "was not yet detained when he handed the Bag to a third party." (Doc. 38 at 15.) The Court finds that Defendant was already detained (i.e., *Terry*-stopped) at that point. In fact, the inception of the stop occurred when Sergeant Wood and Officer Mingo first put their hands on Defendant's shoulder and arm, respectively. Doing so constituted a seizure by force—not to be confused with a seizure by show of authority, which "involves either voluntary submission to a show of authority or the termination of freedom of movement." *Torres v. Madrid*, 592 U.S. 306, 322 (2021). By contrast, a seizure by force requires only the use of force with intent to restrain. *Id.* at 317; *see also California v. Hodari D.*, 499 U.S. 621, 625 (1991) ("[A]n arrest is effected by the slightest application of physical force[.]"). "Put another way, an officer's application of physical force to the body of a person for the purpose of arresting him [i]s itself an arrest—not an attempted arrest—even if the person d[oes] not yield." *Torres*, 592 U.S. at 311 (cleaned up).

Therefore, the Court will assess whether reasonable suspicion existed at the moment the officers made physical contact with Defendant with intent to restrain him. At that point, the totality of the circumstances included: (1) the dispatch call, which had described an ongoing fight; (2) Defendant (and no one else nearby) "yelling loudly," "as if he was in an argument," and "sound[ing] agitated" when the officers arrived (Hrg. Tr. 14:3–9); (3) Defendant's evasive behavior, including walking away from the officers (towards the 105–108 apartment building),

and then ignoring or giving vague answers to their questions; and (4) contextual factors, namely the Property's location in a high-crime area and Officer Dagostino's experience responding to a high volume of calls to the Property, including calls for "disorders" (Hrg. Tr. 44:1–6).

The Court concludes that together, these facts sufficed to give the officers reasonable suspicion to execute a *Terry* stop of Defendant. "[T]he threshold for reasonable suspicion is 'quite low: a moderate chance of finding evidence of wrongdoing' is sufficient." *United States v. Smith*, 140 F.4th 316, 320 (6th Cir. 2025) (quoting *United States v. McAllister*, 39 F.4th 368, 373 (6th Cir. 2022)). When the officers detained Defendant, there was a moderate chance of finding evidence of criminal activity, namely disorderly conduct (whether or not directly related to the fight that was reported). *See* Tenn. Code Ann. § 39-17-305(b). In reaching this conclusion, the Court finds *United States v. Smith*, 594 F.3d 530 (6th Cir. 2010), instructive. In *Smith*, the Court of Appeals concluded that police officers had reasonable suspicion justifying a *Terry* stop because the totality of the circumstances "included: (1) the emergency 911 call; (2) Smith's efforts, with his head down, to push past the officers and exit the building as the officers entered; (3) that these events took place in a high-crime area in (4) the very early hours of the morning; and (5) Smith's vague responses to the officers' questions." *Id.* at 539.

All but one of these considerations (the time of day) similarly factored into Sergeant Wood and Officer Mingo's seizure of Defendant. First, the information from the dispatch call validly contributed to the officers' reasonable suspicion when they arrived on the scene and heard, then observed, Defendant yelling. Defendant tries to discredit the dispatch call because "an anonymous tip alleging criminal conduct, alone, is typically insufficient for police to have reasonable suspicion to perform a *Terry* stop." (Doc. 17 at 9 (citing *Florida v. J.L.*, 529 U.S. 266 (2000) and *Alabama v. White*, 496 U.S. 325 (1990).) The Court agrees that the dispatch call *alone* likely would not

have given the officers a valid justification to stop Defendant—particularly because, as the R&R notes and the officers described in their testimony, various individuals remained in the courtyard area throughout the incident, and there were no physical signs that the reported fight had actually occurred. But the officers did not act on an uncorroborated, anonymous tip alone. Rather, the dispatch call was just the initial factor of several that, combined, had created reasonable suspicion by the time Defendant was seized.

Second, although Defendant did not try to push past the officers like the defendant in *Smith*, he repeatedly walked around or away from them. Thus, although Defendant's behavior was not "aggressive" like that of the *Smith* defendant, it was similarly evasive. *See Smith*, 594 F.3d at 540–41 (noting, in addition to Smith's aggressive behavior, that his efforts to push through the officers constituted flight or, at minimum, "nervous, evasive behavior," and that "throughout the encounter," Smith was "very agitated and unsettled"); *see also Robinson v. Howes*, 663 F.3d 819, 830 (6th Cir. 2011) ("Nervousness, hurrying away from the police, and other evasive behavior are relevant factors in the reasonable suspicion analysis.") (citing *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

Third, the Property was located in a high-crime area. As noted above, the Court of Appeals has cautiously condoned some reliance on such contextual factors. *See Young*, 707 F.3d at 603–04. And lastly, Defendant continued to respond vaguely to the officers' questions as he paced around the area. As the *Smith* Court noted, "while a suspect's refusal to answer or listen does not, by itself, justify a reasonable suspicion of criminal activity, it can be a factor that, together with other factors, supports a finding of reasonable suspicion." *Smith*, 594 F.3d at 541. Applying that logic, the court found that "Smith's evasive, non-responsive, and vague answers to the officers' questions, which (in part) prompted [the officer's] instruction to stop, also provided some

additional basis for the officers' reasonable suspicion." *Id.* Defendant argues that "[w]hile his answers may not have been descriptive or polite, Mr. Brooks was interacting and actively engaging with the officers, not running away or becoming aggressive with them." (Doc. 43 at 3.) But this argument overlooks the fact that a defendant's evasiveness and non-responsiveness, although less obviously suspicious than running away or displaying aggression, are also traits that officers may properly consider as part of the totality of the circumstances. The Court agrees that "[t]here are multiple reasons that a person might want to minimize their contact with police officers; it does not necessarily suggest that a person is engaged in criminal conduct." (*Id.*) But ultimately, officers may properly weigh evasiveness in response to police questioning as one consideration in their determination of whether or not reasonable suspicion exists to conduct a stop. *See Smith*, 594 F.3d at 539; *United States v. Lewis*, 843 F. App'x 683, 691 (6th Cir. 2021) (defendant's evasiveness when asked for his name contributed to officer's reasonable suspicion). Moreover, officers do not need to rule out every innocent explanation of conduct in order to develop reasonable suspicion. *See United States v. Arvizu*, 534 U.S. 266, 277 (2002); *United States v. Saperstein*, 723 F.2d 1221, 1229 (6th Cir. 1983).

Thus, despite finding that Defendant was detained earlier in the interaction with the officers, the Court still agrees with the R&R's final conclusion that reasonable suspicion existed to justify the *Terry* stop at its inception.

**2. The stop was reasonable in scope.**

The Court concludes also that the stop was reasonable in scope. *See Smith*, 594 F.3d at 536 (6th Cir. 2010) (quoting *Caruthers*, 458 F.3d at 464). "Courts consider the length of the detention, the manner in which it is conducted, and the degree of force used in determining whether an investigative stop is 'reasonably related to the basis for the original intrusion.'" *Smoak*, 460

F.3d at 781 (quoting *Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814 (6th Cir. 1999)). Here, the length of detention was brief before ripening into an arrest supported by probable cause for trespassing. The officers conducted the detention reasonably, including by continuing to communicate with Defendant throughout and instructing him to hand off the infant he was holding to someone else. Likewise, the degree of force used was reasonable. The officers first placed their hands on Defendant's shoulder and arm, and then, when Defendant displayed some resistance, they handcuffed him. Officer Dagostino testified that the officers detained Defendant for both officer safety and investigation. In light of these facts and how they correspond to the officers' reasonable and articulable suspicion, the Court finds that the scope of the stop was reasonable.

### B. The R&R likewise properly concluded that the "*Terry* seizure" of the Bag was constitutional.

Although less familiar than the *Terry* stop, the Supreme Court has also recognized the authority to conduct a *"Terry* seizure" of personal property. *See Bennett v. City of Eastpointe*, 401 F.2d 810, 825 (6th Cir. 2005); *see also Saperstein*, 723 F.2d at 1231 (noting that "seizures of personal effects when based on anything less than probable cause" must "f[a]ll within the permissible bounds of a *Terry*-type investigative detention"). In short, "some brief detentions of personal effects may be permitted based upon reasonable suspicion falling short of probable cause, provided that such detentions are 'minimally intrusive.'" *Farm Lab. Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 544 (6th Cir. 2002) (quoting *United States v. Place,* 462 U.S. 696, 706 (1983)).

A court engages in a two-step inquiry, which resembles the ordinary *Terry*-stop analysis, to assess the validity of such a seizure. "First, the Court must determine whether the detaining

officer has a reasonable and articulable suspicion that the property he wishes to seize is connected with criminal activity." *Bennett*, 410 F.3d at 825 (quoting *Farm Labor*, 308 F.3d at 544; *United States v. Sanders*, 719 F.2d 882, 887 (6th Cir. 1983)). Next, the court must ask whether the seizure was reasonable "in both duration and intrusiveness." *Farm Labor*, 308 F.3d at 544 (citing *Place*, 462 U.S. at 709).

With respect to the first step, Defendant argues that the officers' only basis for seizing the Bag was, as Officer Dagostino described in his testimony, that people "have a tendency to carry firearms or narcotics in those style bags" (Hrg. Tr. 51:6–9). (Doc. 37 at 2.) But, as the R&R points out, the officers acted on more than that. Most notably, Officer Dagostino also testified that Defendant's attempt to hand off the Bag or distance himself from the Bag was suspicious because, in his experience, people often attempt to distance themselves from contraband. The Court of Appeals has confirmed that such movement may validly increase an officer's level of suspicion. *See, e.g.*, *United States v. Peake-Wright*, 126 F.4th 432, 439 (6th Cir. 2025) (concluding that the police had probable cause to believe that defendant's jacket contained contraband, based in part on his abrupt removal of the jacket when an officer approached); *United States v. Allison*, 814 F. Supp. 3d 848, 873 (E.D. Mich. 2026) (highlighting defendant's distancing himself from his phone as one factor that justified temporary seizure of the phone). And this analysis does not change because Defendant may have been giving the Bag to the young woman in preparation to be taken to jail. (*See* Doc. 43 at 7.) As already noted, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277; *see also Saperstein*, 723 F.2d at 1229. Therefore, even if the officers considered this possibility, that consideration would not have negated their "reasonable and articulable suspicion that the [Bag]

. . . [wa]s connected with criminal activity," namely possession of contraband. *See Bennett*, 410 F.3d at 825.

Turning to the second step, the Court again concludes that the seizure of the Bag was reasonable "in both duration and intrusiveness." *See Farm Labor*, 308 F.3d at 544 (citing *Place*, 462 U.S. at 709). The duration of the seizure was brief. Officer Forgey arrived and identified Defendant as trespassed from the Property less than one minute after Officer Dagostino had seized the Bag. (Doc. 38 at 16.) This information from Officer Forgey established probable cause for Defendant's arrest, and the officers then properly searched the Bag incident to the arrest. (*See* IV.C, *infra*.) Naturally, this search incident to arrest terminated the mere *Terry* seizure of the Bag. This brief duration of the seizure was reasonable because of the officers' suspicions that the Bag contained contraband and, relatedly, the officer-safety concerns that would have arisen from an unknown third party's taking the Bag. The level of intrusiveness—again, scrutinizing only the period during which Officer Dagostino had seized the Bag, but Officer Forgey had not yet identified Defendant as trespassed from the Property—was also limited and therefore reasonable. Officer Dagostino merely held the unzipped Bag by its strap while Defendant was being handcuffed and patted down for weapons.

### C. The inevitable-discovery doctrine is inapplicable, but the firearm was properly discovered as part of a search incident to arrest.

The next dispute centers on the search of the Bag upon Officer Forgey's arrival, which led to the discovery of the firearm that Defendant seeks to suppress. With respect to the search of the Bag, the R&R concluded "that the inevitable discovery doctrine applies, as the Bag would have been searched (and the firearm recovered) under inventory protocol pursuant to CPD policy." (Doc. 38 at 16.) The Court disagrees. Because Officer Dagostino admitted that it was in the

officers' discretion to detain the Bag or allow the young woman to take it from Defendant, given that he was going to jail (*see* Hrg. Tr. 86:4–8), it was not inevitable that the firearm would have been discovered during an inventory search. (*See* Doc. 43 at 9–10.) The Court cannot assume that under the CPD's "routine procedures that police would have used regardless of the illegal search," the officers would have seized the Bag from the young woman. *See United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002) (quoting *United States v. Ford*, 184 F. 3d 566, 577 (6th Cir. 1999)). And the Government has not demonstrated that it would have, or could have, obtained a search warrant for the Bag had the officers left the scene without it. Given this uncertainty, the inevitable-discovery doctrine cannot apply.

Nonetheless, the Court is persuaded by an alternative justification put forth by the Government: the search-incident-to-arrest doctrine. In short, the Court finds that the officers validly searched the Bag incident to Defendant's arrest despite the Bag's no longer being on Defendant's person when the search occurred. Defendant argues that this conclusion conflicts with the Supreme Court's holding in *Arizona v. Gant*, 556 U.S. 332 (2009). But as the parties acknowledged in their briefs and at the hearing, some uncertainty exists in the law regarding the reach of the Supreme Court's holding in *Gant*—namely, as to whether *Gant* applies only to searches of automobiles or also covers searches of other personal property. Defendant argues that "*Arizona v. Gant* clarified that the search incident to arrest exception centers on the accessibility of the item or place at the time of the *search*" and that *Gant*'s logic extends to other property that a suspect is unable to access at the time of the search. (Doc. 31 at 2–4.) The Government responded to this argument at the hearing, asserting that "the Sixth Circuit has had numerous opportunities to extend *Gant* beyond the automobile exception and has declined every time. *Gant*

does not apply to Search Incident to Arrest of personal property and belongings in the Sixth Circuit." (Hrg. Tr. 101:13–20.)

The Court has not identified any Court of Appeals cases expressly declining to extend *Gant*. But there is case law that speaks to the narrow issue here—the authority to search personal property that was in the arrestee's control at the beginning of his encounter with law enforcement, but in the officers' control by the time they conducted the search on the scene. *See United States v. Blevins*, 234 F.3d 1270 (Table), 2000 WL 1597821 (6th Cir. 2000). In *Blevins*, the Court of Appeals held that "'when a container is within the immediate control of a suspect *at the beginning of an encounter with law enforcement officers*; and when the officers search the container at the scene of the arrest[,] the Fourth Amendment does not prohibit a reasonable delay . . . between the elimination of danger and the search.'" *Id.* at *4 (quoting *United States v. Han*, 74 F.3d 537 (4th Cir.), *cert. denied*, 517 U.S. 1239 (1996)) (alteration in original but emphasis added).

In *Blevins*, both the Ohio police and the Federal Bureau of Investigation had been searching for the defendant when officers located him at a motel and confronted him as he headed towards a waiting car. *Id.* at *1. After arresting him, an officer proceeded to search a small blue bag that Blevins had been carrying over his shoulder, but had put on the ground when the officers approached and ordered him to lie down. *Id.* at *3. In challenging the search of the bag, the defendant argued that "once officers have gained exclusive control over a suspect's property, a subsequent search of the property is unreasonable in the absence of a search warrant." *Blevins*, 234 F.3d at *3. Defendant puts forth a similar argument here. (*See* Doc. 51 at 2.) But the *Blevins* Court rejected this argument, emphasizing that "arresting officers are privileged to search a suspect's baggage *at the same time of the arrest* even though the danger to the officers or the risk of evidence destruction has passed." *Blevins*, 234 F.3d at *3 (emphasis added).

Here, the scenario resembles that in *Blevins*. Even though the officers had gained exclusive control over the Bag by taking it from the young woman when Defendant was placed under arrest, they were still authorized to search the Bag incident to his arrest at that point in time. Any danger posed by the young woman's possession of the Bag had passed. But given the close temporal proximity between Defendant's arrest and the search of the Bag, and the fact that Defendant had been wearing the Bag when he was initially detained, the search still qualifies as one incident to arrest. The Court will therefore modify the R&R (Doc. 38) to reflect that the search of the Bag was justified as a search incident to arrest, not based on the inevitable-discovery doctrine.

### D. The Court need not analyze Defendant's "fruit of the poisonous tree" argument, nor the Government's argument that the good-faith exception to the exclusionary rule applies, in order to make its ruling.

Finally, the Court addresses Defendant's objections to the R&R's declining to consider certain arguments. (*See* Doc. 43 at 1, objecting to the R&R's failure "to address the 'fruit of the poisonous tree' or the good faith exception to the exclusionary rule" and "whether Officer Forgey's manipulation of the bag satisfied the plain view or search incident to arrest exceptions to the Fourth Amendment's warrant requirement"). Besides the search-incident-to-arrest exception, which the Court has already discussed (*see* IV.C, *supra*), the Court will likewise decline to analyze these additional arguments. The conclusions reached above suffice to resolve Defendant's motion to suppress. Therefore, judicial economy and constitutional avoidance are best served by not engaging in additional deliberations that are unnecessary to the disposition of the motion.

## V. CONCLUSION

For the foregoing reasons, Defendant's objections to the R&R (Doc. 43) are **OVERRULED**, the R&R (Doc. 38) is **ADOPTED in part and MODIFIED in part**, and Defendant's amended motion to suppress (Doc. 17) is **DENIED**.

**AN APPROPRIATE ORDER WILL ENTER.**

**/s/_____________________________**
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**